**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

_____

| | |
|---|---|
| NEW BEGINNINGS HEALTHCARE ) | |
| FOR WOMEN, LLC, on behalf of itself ) | |
| and all others similarly situated, ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION |
| ) | |
| v. ) | NO. 1:17-cv-00950-RWS |
| ) | |
| EVO PAYMENTS INTERNATIONAL, ) | |
| LLC and EVO MERCHANT SERVICES ) | |
| LLC, ) | |
| ) | |
| Defendants. ) | |

_____)

## <u>AMENDED CLASS ACTION COMPLAINT</u>

Plaintiff New Beginnings Healthcare for Women, LLC, by and through its

undersigned counsel, on behalf of itself and the class of persons and entities

preliminarily defined below, submits this Amended Class Action Complaint

pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), and alleges the following

based on personal knowledge as to allegations regarding Plaintiff and on

information and belief as to other allegations.

# INTRODUCTION

1.     This is a civil action seeking monetary damages, restitution, and declaratory relief against Defendants EVO Payments International, LLC and EVO Merchant Services, LLC (collectively, "EVO") arising from EVO's assessment of improper and excessive fees for credit and debit card processing.

2.     In today's business world, the vast majority of merchants accept payment for goods and services via credit and debit cards. Indeed, because the majority of customer payments are made via credit and debit cards, acceptance of such payments is necessary for most merchants to survive in the marketplace.

3.     In order to accept this method of payment, the merchant is required to utilize payment processing services.

4.     Merchants rely on the companies that provide such services to do so at a fair price. Indeed, for some businesses, fees for card processing services are the third highest expense merchants incur, following labor and product costs.

5.     The card processing system can be a difficult one to understand, with many parties involved. For instance, in addition to the merchant which receives payment and the customer who provides such payment, the processing of a card transaction involves several other parties:

a.    The Card Issuer – the company that issued the credit or debit card to the customer, which is typically a bank such as Chase or Bank of America, and which charges a fee whenever a customer uses one its cards for a transaction. These companies charge fees that are usually calculated as a percentage of a transaction plus a per-transaction fee (e.g., 1.65% + $0.10/transaction).  This fee varies based on the type of card used.  For example, the card issuing companies will charge a higher fee for transactions involving a rewards credit card than a card with no rewards program.  These fees are generally known as "interchange rates."

b.    The Card Network – the card networks (i.e., Visa, MasterCard, Discover) also charge per transaction fees.  By way of example only, Visa assesses a set fee known as the "APF" ("Acquirer Processing Fee"), and MasterCard charges a set fee known as the "NABU" ("Network Access Brand Usage") fee. The card networks also charge various additional fees depending on the type and nature of a given transaction.

c.    The Payment Processor – this is the entity that actually processes the payment through the card network and ensures that whenever a customer pays for an item or service with a credit or debit card the customer's account is debited and the merchant's account is credited.

d. <u>The Member Bank</u> – only banks, such as Deutsche Bank, may be members of card networks. These member banks "sponsor" payment processors so they may process transactions through the card networks.

e. <u>The Merchant Acquirer</u> – this is the entity which – in conjunction with Independent Sales Organizations ("ISOs") – markets the payment processor's services to merchants. ISOs are sometimes referred to as Merchant Services Providers ("MSPs"). Merchant acquirers and ISOs essentially act as a "middle man" between merchants and payment processors. They enroll merchants in payment processing services and then are usually supposed to provide customer support to the merchant and handle monthly billing. Defendant EVO declares itself a "registered ISO and MSP of Deutsche Bank, AG." It can also be described as a merchant acquirer because it acquires merchants from other ISOs.

6. Ordinarily, a merchant that desires to accept credit and debit cards as a form of payment obtains such services through an ISO or merchant acquirer. For convenience, the term "merchant acquirer" is used below.

7. At the outset of their relationship, the merchant and the merchant acquirer reach consensus on the fees and charges the merchant will pay for payment processing services. Such fees and charges can take a variety of forms, including "per item" fees, fees based on a percentage of the transaction amount,

and monthly or annual fees.

8.     After terms are accepted and processing begins, the merchant acquirer sends monthly billing statements to the merchant that reflect the prior month's activity and specify the fees imposed.

9.     The number of involved parties, moving pieces, and the formatting of monthly billing statements can make it difficult for small and medium-sized merchants to understand whether the fees they are being charged are proper.  Large merchants, by contrast, typically have the resources to ensure that their charges are in line with those they agreed to pay.

10.     Unfortunately, some merchant acquirers take advantage of this confusion.  They induce "mom and pop" merchants to use their services with the promise of low, straightforward pricing, but once the parties are doing business, they sneak in new fees and mark-ups.

11.     These additional fees are often imposed in a deceptive fashion, such that it is very difficult for merchants to even notice them.  Moreover, even if a merchant does notice the new or increased charges, they are labeled in such a manner to appear as though they are required by law or by one of the card networks.

12.     In reality, however, these improper fees are being assessed for the sole purpose of raising additional revenue at the merchant's expense.

13.     This case challenges the amount and nature of the payment processing fees that EVO imposes.

## JURISDICTION AND VENUE

14.     This case was originally filed by Plaintiff in the Superior Court of Fulton County, Georgia.     EVO removed the case to federal court.     Despite Plaintiff's preference for state court, it does not dispute that this Court also has proper jurisdiction.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 potential Class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state other than Georgia.

15.     This Court has personal jurisdiction over Defendants because they are registered to transact business in Georgia and have engaged in a continuous and systematic course of doing business in Georgia by offering their services to thousands of Georgia merchants and citizens.     Further, the global headquarters of EVO Payments International, LLC is located in the Northern District.

16.     Venue lies within this judicial district under 28 U.S.C. § 1391 because EVO Payments International, LLC has its headquarters here and both Defendants

conduct substantial business in this district, and a substantial portion of the events, omissions, and acts giving rise to the claims herein occurred in this district.

## THE PARTIES

17.     Plaintiff New Beginnings Healthcare for Women, LLC is a former customer of EVO.  Plaintiff is a Pennsylvania limited liability company and is a small and independently owned nurse practitioner's office in Williamsport, Pennsylvania, that provides healthcare services to individuals.

18.     Defendant EVO Payments International, LLC ("EVO Payments") is a Delaware limited liability company that is registered to do business in Georgia.

19.     According to its website, EVO Payments:

is the largest privately held payment processor and acquirer for merchants, Independent Sales Organizations (ISOs), financial institutions, government organizations, and multinational corporations throughout the United States, Canada, and Europe.  EVO processes $50 billion in transactions annually and actively services over 500,000 merchant customer businesses.

20.     EVO Payments' global headquarters is located in Atlanta, but its North American headquarters is in Melville, New York.

21.     Defendant EVO Merchant Services, LLC ("EVO Merchant Services") is a Delaware limited liability company that is registered to do business in Georgia.

22.     EVO Merchant Services is an affiliated company to EVO Payments and, upon information and belief, has participated in direct business relationships with Plaintiff and other similarly situated merchants.

### FACTUAL ALLEGATIONS

A.     Plaintiff and EVO Agree to the Nature and Amount of Fees and Charges.

23.     In May of 2015, an agent for EVO approached Plaintiff and informed it that it could lower its costs for debit and credit card payment processing by switching to EVO as its payment processor.

24.     EVO's agent and Plaintiff preliminarily agreed on the payment processing fees and charges Plaintiff would pay if it switched to EVO.

25.     EVO's agent informed Plaintiff that she would memorialize these stipulations in an agreement and fax it to Plaintiff.

26.     On May 14, 2015, EVO transmitted a fax to Plaintiff.  The fax contained a two-page Merchant Application, a Terminal Placement Agreement, a document agreeing to waive any "early closure fee," and a document labeled "price protection certificate."

27.     Plaintiff's owner Rana Colaianni reviewed the two-page Merchant Application.  The Merchant Application was difficult to read because the print was extremely small and had been blurred because it had been transmitted by fax.

However, prominently disclosed at the top of the second page was the agreed upon pricing information, which matched the EVO agent's earlier representations.

28.    On May, 18, 2015, at the direction of EVO's agent, Ms. Colaianni signed the Merchant Application on Plaintiff's (and her own) behalf. *See* Merchant Application (Exhibit A hereto). She then returned it and the Terminal Placement Agreement, which she also signed, to EVO via fax. She did not return the other contract documents that were faxed (which did not require signature).

29.    At this time, Ms. Colaianni reasonably believed the documents she had received were the payment processing contract between the parties. For example, the Application refers to itself as "this Agreement." The Application also indicates that the member bank must be a "signer" to "the Merchant Agreement" and provides a space at the bottom for the member bank to sign.

30.    Moreover, there were plenty of "fine print" terms and conditions in the Application. Thus, while the Application refers to "the Terms and Conditions of the Merchant Processing Agreement," Ms. Colainni believed this referred to the extensive terms and conditions set forth in the Application itself. The Application certainly never referred to "the Terms and Conditions of the Merchant Processing Agreement" as being a separate document.

31.     Although Plaintiff did not notice it at the time, at the bottom of the Application is a notation indicating that it is pages one and two of six.  However, given that EVO faxed several other pages of contract documents (*see* ¶ 26, *supra*), Plaintiff would have had no reason to believe that she had not received all contract documents.

32.     In sum, Ms. Colaianni had no reason to believe that the Application and the other documents she had been faxed did not constitute the entire contract between the parties.  This is especially true because she was not given any other applicable contract documents by the EVO agent.

B.     No Binding Contract Is Ever Consummated Between the Parties.

33.     Despite Plaintiff signing the Application, no binding contract was ever consummated between the parties.

34.     Indeed, in several different sections of the Merchant Application, which was drafted and approved by EVO and Deutsche Bank, AG (EVO's member bank), it is made clear that both EVO and "BANK" must accept and sign the Application before it would become a legally binding contract.  For example:

a.     On page 1, the Application states that "A Visa Member [i.e., Deutsche Bank] *must be* a principal (*signer*) to the Merchant Agreement" (emphasis added);

b. On page 2, it states: "**MERCHANT UNDERSTANDS THAT THIS AGREEMENT SHALL NOT TAKE EFFECT UNTIL MERCHANT HAS BEEN APPROVED BY BANK AND A MERCHANT NUMBER IS ISSUED**" (emphasis in original); and

c. Also on page 2, there are detailed signature blocks for EVO and Deutsche Bank, AG, stating "Accepted by EVO Merchant Services, LLC" and "Accepted by Deutsche Bank AG, New York."

35. That EVO and Deutsche Bank must sign the Application for a binding contract to be formed is also required by the applicable rules of the card networks. *E.g.,* MasterCard Rules, § 7.6.1 (stating that all merchant agreements ***must*** be "signed by the Customer," with "Customer" defined to include the member bank). Further, MasterCard requires the contract to state: "The Merchant Agreement ***is not effective*** and may not be modified in any respect ***without the express written agreement of the Customer*.**" *Id.* at § 7.6.1(1)(b) (emphasis added). MasterCard specifically ***prohibits*** that the contract "take effect or imply that it takes effect prior to being ***signed by the Customer*.**" *Id.* at § 7.6.1(3) (emphasis added). Pursuant to MasterCard Rule 5.1, EVO and Deutsche Bank could be subject to an "assessment up to USD 2,500 per day" for ***each day*** they are not in compliance as to ***each merchant***.

36.     This signature requirement was mutually beneficial.  It provided assurances to Plaintiff that it could enforce the proposed contract.  After all, Plaintiff's discussions about the terms had all been with a low-level representative who was certainly not authorized to sign for EVO and the Bank.  Thus, having a signed agreement was necessary to allow Plaintiff to protect itself if EVO or Deutsche Bank breached it.  The signature requirement also allowed EVO and the Bank the final say over whether they were bound by the inclination of the EVO agent to actually contract with Plaintiff.  Obviously, if the agent agreed to terms that either EVO or the Bank believed were not acceptable, they could withhold signature.  Moreover, without the signature requirement, EVO and Deutsche Bank would be subject to enormous assessments by the card networks for violating their clear rules.

37.     Despite the express condition precedent in the proposed contract (and the legal requirements of the card networks) that both EVO and Deutsche Bank sign the Application in order for an effective contract to be formed, neither EVO nor Deutsche Bank ever signed the Application.  Even upon request by Plaintiff, no signed version of the proposed contract was provided.  This is EVO's standard practice.  Indeed, except for the extremely rare instance when such signatures are demanded by large merchants, EVO never procures signatures from its own

authorized officer or one from Deutsche Bank. Discovery will be needed to confirm the reasoning behind EVO's policy of not signing the proposed contracts, and of failing to require that the Bank do the same. Obviously, however, such a scheme allows EVO to be free from any contractual constraints on what it can charge merchants. As will be illustrated below, EVO takes full advantage of such freedom.

38.     Plaintiff has not waived its right to rely on the signature requirement in the proposed contract.

C.     EVO Imposes Unjust Fees and Charges on Plaintiff.

39.     Even without a contract, the parties began to do business.

40.     During the course of the parties' relationship, EVO imposed numerous fees and charges on Plaintiff that were unfair and improper. Among the numerous improper charges were the following:

a.     Throughout its time as a customer, EVO charged Plaintiff a rate of $.03 for each MasterCard transaction. This amount exceeded the published "NABU" fee rate at all times;

b.     In July 2015, EVO charged Plaintiff a "Shipng Fee" of $29.99. Plaintiff never agreed to pay such fee;

c. From September 2015 through December 2015 and from May 2016 through June 2016, EVO charged Plaintiff a monthly "NON PCI FEE" of $19.99;

d. In April 2016, EVO charged Plaintiff a $99 "PCI COMPLIANCE FEE";

e. In June 2016, EVO charged Plaintiff a $99 "IRS REPORTING FEE"; and

f. Numerous other fees and charges which exceeded the actual amounts assessed by the card networks but were represented as merely pass-through costs by EVO.

41. EVO led Plaintiff to believe that some of the above-referenced fees were mandated by law. However, the fees were not required by law, but were imposed and collected solely by EVO for its own benefit. They were improper and subject to disgorgement by EVO pursuant to the claims herein. The fees were also improper because they were not approved – and certainly not expressly in a written agreement – by Deutsche Bank. The card networks require all changes to the contract to be approved by the bank in writing. *E.g.*, MasterCard Rules, § 7.6.1(1)(b) ("The Merchant Agreement is not effective and may not be modified in any respect without the express written agreement of the Customer.").

42.     EVO automatically deducted the improper fees referenced herein from Plaintiff's account before Plaintiff received the monthly statement showing the fee. Thus, any payment of such fees by Plaintiff was not voluntary.

43.     On occasion, Plaintiff would discover that EVO had assessed and deducted an improper fee and would contact EVO to complain.  Plaintiff was able to convince EVO to refund some of these unjust fees, but not all of them.

44.     In July 2016, after repeatedly being charged improper fees, Plaintiff terminated its account with EVO.    However, despite acknowledging the termination, EVO did not immediately close the account.

45.     It was not until EVO assessed a few months of additional unfair fees and charges that Plaintiff's account was finally closed.

D.     <u>Plaintiff Files Suit and EVO Threatens to Enforce Terms that Were Never Provided to Plaintiff.</u>

46.     Plaintiff filed her Complaint on January 19, 2017.  Plaintiff sought declaratory judgment that the contract never became effective because EVO and Deutsche Bank failed to sign it.  Plaintiff also sought restitution via the doctrine of unjust enrichment.

47.     After EVO had been served, Plaintiff received a letter from EVO disputing the claim that the contract never became an effective document.  EVO conceded that neither it nor Deutsche Bank had ever signed the contract but stated

it was "enforceable regardless of whether it is counter-signed." EVO also threatened to enforce several contractual terms, including but not limited to an obligation to make and resolve billing disputes within a certain time period, a limitation of liability clause, a provision purporting to apply New York law and require all suits to be filed in New York, a class action waiver, and a provision that purported to require Plaintiff to pay EVO's attorney's fees in any billing dispute.

48.    Most importantly, EVO threatened to bankrupt Plaintiff and its owner by enforcing a provision it had never even provided to Plaintiff. As the letter stated:

> Finally, we note that NBHC [Plaintiff] has agreed to pay EVO for the attorneys' fees EVO incurs in defending against this claim, and NBHC's owner guaranteed these obligations. Specifically NBHC, and through the guarantee, its owner, agreed to reimburse EVO "for all costs and expenses, including reasonable attorney's fees, incurred by EVO, Bank or their agent in any action arising out of, relating to, or in connection with this Agreement, without regard to whether there has been an adjudication on the merits in any such action." *Id.* To the extent this case proceeds, EVO will have no choice but to enforce its right to reimbursement.

This contractual language was never provided to Plaintiff. Nevertheless, EVO tried to utilize this term to scare Plaintiff into dropping the case. An email from EVO's counsel two weeks later was even more pointed:

> You should know, to confirm a point that I mentioned to you in the letter I sent, that NBHC's agreement with EVO requires NBHC to indemnify EVO for costs EVO incurs in defending itself in this case.

> In other words, the more we have to do in defense of this case, the
> more EVO intends to seek from NBHC, through the indemnity. We
> were hopeful that would help avoid costly litigation.

Despite these threats, Plaintiff decided to pursue the case. Although Plaintiff's

losses may only be a few hundred dollars, it is important that EVO be stopped

from its ongoing improper practices which harm hundreds of thousands of small

businesses in the United States.

49. Plaintiff consulted the Merchant Application (i.e., the only relevant

contract document she had ever been provided) and *none* of these referenced terms

were included. Plaintiff maintains thorough records and has confirmed that these

terms were never provided to it. Notably, there was no mention of possibly paying

EVO's legal fees in any document Plaintiff had been provided.

50. Plaintiff asked EVO to send a copy of the contract to which it was

referring. EVO eventually sent a three-page, tiny print boilerplate document

labeled "Merchant Processing Agreement" (hereinafter, "the Terms") on March 22,

2017, shortly before filing its motion to dismiss (Dkt. No. 4). A copy of this

document is attached hereto as Exhibit B.

51. Plaintiff was never previously provided the "Terms" by EVO. Again

Plaintiff checked its files – which are kept diligently by Ms. Colaianni and a small

staff – and no such document was present. Plaintiff did, however, locate the fax

that EVO sent on May 14, 2015, that contained the Merchant Application and verified that the Terms was ***not*** among the documents that were faxed.

52.     Plaintiff presented evidence to EVO that the Terms were never provided to Plaintiff.  To date, EVO has not provided Plaintiff with any contrary evidence.

53.     Upon close inspection it is obvious that the document which EVO has provided to the Court as Exhibit A to its Motion to Dismiss (Dkt. No. 4-1), and which EVO contends is Plaintiff's contract, is not.  The first two pages of the document plainly show that they were faxed by EVO agent Cathy Kennedy on May 14, 2015.  Plaintiff maintains a copy of that fax transmission, and it does not include the remaining pages of the document proffered by EVO.  The first two pages of the document also plainly show that they were faxed back to EVO by Plaintiff on May 18, 2015.  The remaining pages of the document (which have had page numbers 4 through 6 added at the bottom) do not include either of the fax transmission records.

54.     Upon further inspection, the pages of the purported contract have obviously been taken from different documents, cobbled together digitally by EVO, and submitted as one document in a fashion designed to mislead the Court. The font and copy quality of pages 4 through 6 bear no resemblance to pages 1 and

2. Indeed, pages 4 through 6 are digital formatted such that they can be cut-and-pasted from, whereas the first two pages are scanned and of a much lower clarity.

55.     On March 31, 2017, Plaintiff informed EVO's counsel via telephone that the purported contract was not Plaintiff's contract. The information was summarized in email correspondence on that same day. EVO has subsequently made clear that it cannot dispute Plaintiff's showing. EVO has failed, however, to notify the Court and is apparently refusing to withdraw the fabricated document.

56.     On April 7, 2017, EVO filed a motion to transfer venue to the United States District Court for the Eastern District of New York, in accordance with the forum selection clause in the Terms. *See* Dkt. No. 7. Once again, this provision was not a part of Plaintiff's contract.

57.     At the time the transfer motion was filed, EVO knew that Plaintiff was never provided with the Terms and that Plaintiff had direct evidence (i.e., the May 14th fax) to support this contention. Yet, in its motion to transfer, EVO led the Court to believe that that Plaintiff received the Terms.

58.     In so contending, the best EVO could muster was a declaration from a corporate employee that it is EVO's "policy and practice" to provide the Terms to merchants for review prior to execution. Even if this were true (which Plaintiff disputes), there is no evidence that the Terms were so provided *in this case*.

59.     Because the Terms were never provided to Plaintiff and Plaintiff was not on reasonable notice that they existed, they are ineffective and inapplicable, regardless of whether the entire agreement was ineffective because unsigned.

60.     It is EVO's corporate practice not to provide the Terms to prospective customers, particularly those who receive the contract via facsimile transmission. Discovery will be needed to prove this practice and the reasoning behind it, although an obvious explanation would seem that EVO and its agents are fearful that its prospective customers will refuse to do business once they see the onerous, one-sided terms and conditions set forth therein.

E.      Even if the Terms Governed, EVO's Billing Practices Are Still Unlawful.

61.     Even if the Terms had been provided to Plaintiff or other merchants (or somehow otherwise governed their accounts), EVO's billing practices are still unlawful.

*The Contract Remains Ineffective Because It Was Not Signed.*

62.     The Terms do not alter the fact that the contract's effectiveness is conditioned upon signatures from EVO and Deutsche Bank, which never occurred. *See* ¶¶ 33-38, *supra*.  Indeed, the Merchant Application explicitly incorporates the card network rules.  Merchant Application, p. 1 ("Merchant must comply with Visa Operating Regulations."); *id.* (referring to "card association rules" as binding);

Even the Terms explicitly incorporate the applicable rules of the card networks. *See* Terms, ¶ 16(A). This, of course, includes MasterCard's requirement that the member bank sign merchant agreements before it may be deemed effective. *See* ¶ 35, *supra*.

63. The Terms even mandate that merchants assist EVO in complying with these requirements. *See* Terms, ¶ 14 ("You will assist EVO and Bank in complying with all Laws and (card network) Rules now or hereafter applicable to any Card transaction or this Agreement"). No party is entitled to ignore the fact that neither EVO nor Deutsche Bank ever signed the agreement.

*Even if the Contract Became Effective, EVO Breached It.*

64. Even if an effective contract was formed, it did not allow EVO to impose excessive fees and charges on Plaintiff, such as those set forth in Paragraph 40, *supra*. Indeed, these charges are not identified anywhere in the Merchant Application and are thus unauthorized.

65. EVO will likely attempt to defend its conduct by arguing that the Terms provided it with the contractual discretion to increase fees or impose new fee categories. *See* Terms, ¶ 16(H). However, the exercise of such discretion is contingent on providing advance notice to customers. *Id.* And of course all changes needed Deutsche Bank's written authorization. Merchant Application, p.

2 ("EVO and BANK shall not be responsible for any change in printed terms unless specifically agreed to in writing by an officer of EVO and BANK."); MasterCard Rules, § 7.6.1(1)(b) ("The Merchant Agreement is not effective and may not be modified in any respect without the express written agreement of the Customer.").

66. This did not occur. For example, Plaintiff was not provided with advance notice of several of the fee increases and new charges it suffered during the course of its relationship, including but not limited to EVO's mark-up of supposedly pass through charges. Moreover, the form, format, and content of the statement notices given by EVO for some of the charges at issue were insufficient to provide Plaintiff with actual notice of the increases and were therefore ineffective.

67. Moreover, the covenant of good faith and fair dealing constrains EVO's ability to use its discretion to add fees which were not contemplated by the parties. Thus, even if EVO's self-granted ability to increase rates and create new fees is enforceable, EVO is bound to exercise its contractual discretion in good faith. EVO's manipulation of Plaintiff's fees and charges was done for no other reason than to increase profits. This does not comport with good faith and fair dealing.

68.     EVO may also contend that Plaintiff failed to properly dispute any billing irregularities within 30 days of the statements containing such irregularities. *See* Terms, ¶¶ 6(C), 17(B).  These provisions, however, are properly read to only deal with deficiencies in the processing of actual transactions.  For example, they are intended to deal with a situation where a purchase transaction that the merchant ran in the amount of $100 does not even appear on the statement, or where such transaction shows up for $10, as opposed to $100.  These provisions, even if applicable, are plainly not intended to deal with EVO's mark-ups and charges separate from processed transactions.

69.     Even so, some of the charges about which Plaintiff complains (e.g., "NON PCI FEE," "PCI COMPLIANCE FEE," and "IRS REPORTING FEE") were indeed timely and properly disputed.  EVO refunded some of these improper charges but not all of them.

### *EVO Buries Self-Serving Exculpatory Provisions in the Terms.*

70.     The Application itself does not indicate that (a) the agreed-upon fees and rates will increase (nor would increases be expected since technology and competition has actually driven down costs for payment processing) or (b) new, un-disclosed fees and rates will be charged.  Such terms unquestionably are important to merchants and would impact their decision to do business with EVO.

71.     Instead of conspicuously setting forth such critical provisions in the Application, EVO buries them in the fine print Terms.

72.     The take-it-or-leave-it Terms consists of tiny, non-descript font that is barely legible to the naked eye.  It occupies dozens of single-spaced paragraphs over three pages. *See* Terms.

73.     Given the dense legalese of the Terms, there is zero chance of a merchant actually having read or understood them (even if EVO provided them to the merchant).

74.     The Terms contain several provisions that represent a unilateral effort by EVO to covertly backtrack from the rates and fees prominently set forth in the Application and/or immunize itself from liability for improper practices.  Such provisions include but are not limited to those which purport to:

     a.     impose costly "PCI fees" (Terms ¶ 14);

     b.     allow EVO to raise rates and add fees for any reason (or no reason) (*id.* at ¶ 16(H));

     c.     mandate that all billing disputes be raised within 30 days (*id.* at ¶¶ 6(C), 17(B));

     d.     strictly limit EVO's liability to refund improper charges (*id.* at ¶ 9(C);

e.    require customers to waive their right to bring a class action (*id.* at ¶ 16(G));

f.    require customers to waive their right to a jury trial (*id.*);

g.    require customers to resolve disputes in New York (no matter where they are located) pursuant to New York law (*id.*); and

h.    require customers to reimburse EVO for all costs and expenses incurred, including attorney's fees, in any legal action *and regardless of whether EVO is the prevailing party.  Id.*

75.    As this case's chronology demonstrates, EVO uses these self-serving provisions as tools to discourage aggrieved merchants from pursuing legal action for overcharges.  Indeed, if the Court determines that certain of the above provisions are enforceable, Plaintiff will be forced to drop this case no matter how meritorious the claims.

76.    If the Terms are even effective and/or applicable, the provisions highlighted above and others are not explicit, prominent, or clear and are thus invalid exculpatory clauses, violate public policy, lack mutuality, are procedurally and substantively unconscionable, and are otherwise void and unenforceable.

77.    Plaintiff's experiences with EVO are not isolated, but rather are illustrative of Defendants' improper business practices towards its customers.

## CLASS ALLEGATIONS

78.     Plaintiff brings this action on behalf of itself and all others similarly situated.

79.     The Class is defined as:

> All EVO merchant customers in the United States that were assessed an unauthorized fee for payment processing.

80.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate and as the Court may otherwise allow.  Notably, depending on discovery, it may be necessary to exclude the very few merchants (perhaps a few very large corporations) whose applications were actually signed by EVO and Deutsche Bank.

81.     Excluded from the Class are EVO, its parents, subsidiaries, affiliates, officers, and directors, any entity in which EVO has a controlling interest, all customers who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

82.     The time period for the Class is the number of years immediately preceding the date on which the Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendants remedy the conduct complained of herein.

83.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can meet all the applicable requirements of Federal Rule of Civil Procedure 23 and can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

84.     **Numerosity.**   The members of the Class are so numerous that individual joinder of all the members is impracticable.  On information and belief, there are thousands of merchants that have been damaged by Defendants' wrongful conduct as alleged herein.   The precise number of Class members and their addresses is presently unknown to Plaintiffs, but may be ascertained from Defendants' books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, and/or published notice.

85.     **Commonality and Predominance.**  Numerous common questions of law and fact exist as to the claims of Plaintiff and the other Class members.  Such questions include, but are not limited to:

      a.     Whether the card networks require the Merchant Application to be signed by EVO and Deutsche Bank;

b.	Whether the acceptance and signature requirement in the proposed Merchant Application is a condition precedent to the contract's effectiveness;

c.	Whether Plaintiff, Deutsche Bank, the card networks, and the members of the Class have waived their right to require signatures by EVO and Deutsche Bank;

d.	Whether the proposed Merchant Application governs the business relationship between Plaintiff and the other Class members and EVO;

e.	Whether EVO provides the Terms to prospective merchants before they sign the Merchant Application;

f.	Whether the Terms govern the business relationship between Plaintiff and the other Class members and EVO;

g.	Whether EVO has acted and continues to act unfairly by imposing excessive and unauthorized fees on merchants, including Plaintiff and the other Class members, for EVO's own benefit;

h.	Whether EVO has breached its contract, if any exists, with Plaintiff and the other Class members, either directly or via the covenant of good faith and fair dealing;

i.  Whether EVO is liable to Plaintiff and the other Class members for imposing excessive and unauthorized fees on merchants for EVO's own benefit;

j.  Whether certain of the Terms are not explicit, prominent, or clear and are thus invalid exculpatory clauses, violate public policy, lack mutuality, are procedurally and substantively unconscionable, and are otherwise void and unenforceable; and

k.  Whether EVO should be enjoined from engaging in any or all of the unfair practices complained of herein.

86.  Other questions of law and fact common to the Class include:

a.  The proper method or methods by which to measure damages and/or restitution; and

b.  The declaratory and/or injunctive relief to which the Class is entitled.

87.  EVO has engaged in a common course of conduct toward Plaintiff and the other Class members. The common issues arising from this conduct that affect Plaintiff and the other Class members predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

88. **Typicality.** Plaintiff's claims are typical of the other Class members' claims because, among other things, all of the claims arise out of a common course of conduct and assert the same legal theories. Further, Plaintiff and members of the Class were comparably injured through the uniform misconduct described above.

89. **Adequacy of Representation.** Plaintiff is an adequate Class representative because its interests do not conflict with the interests of the other Class members; Plaintiff has retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiff intends to prosecute this action vigorously. Class members' interests will be fairly and adequately protected by Plaintiff and its counsel.

90. **Declaratory and Injunctive Relief.** EVO has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive and declaratory relief, as described below.

91. **Superiority.** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and each of the other Class members are small compared to the burden and expense that would be

required to individually litigate their claims against EVO, thus rendering it impracticable for Class members to individually seek redress for EVO's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**REQUESTS FOR RELIEF**

**COUNT ONE**
**DECLARATORY RELIEF –**
**NO BINDING CONTRACT EXISTS**

92. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

93. Class-wide declaratory relief is appropriate if a defendant has acted or refused to act on grounds generally applicable to the class.

94. Defendants have established a contracting system through which they obtain merchant signatures on the EVO Merchant Application but never conclude such proposed agreements by signing the contract, obtaining the member bank's signature on the contract, and returning it to the merchant.

95.     By the plain terms of EVO's own form contract, however, signatures from EVO and the Bank are conditions precedent to the contract's effectiveness. Moreover, EVO and Deutsche Bank are precluded by the card networks from entering contracts with merchants unless and until such agreements have been approved and signed by their authorized officers.   The card network rules are binding regardless of which version of the EVO contract is at issue.

96.     The Court should also declare that Plaintiff and the Class members have not waived any rights to rely on the signature requirement.  Further, for Class members who still process transactions through EVO, the Court should declare that EVO and Deutsche Bank cannot now sign such contracts in an effort to make them effective.

97.     The Court should declare that there is no binding, enforceable contract between EVO, on the one hand, and Plaintiff and the Class members, on the other hand.

98.     Judicial declarations in this regard are necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to the proposed merchant contract.

## COUNT TWO
## UNJUST ENRICHMENT

99.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

100.   Plaintiff, on behalf of itself and the Class members, asserts a common law claim for unjust enrichment, which, given the absence of an enforceable contract between the parties, will dictate that EVO disgorge all improper fees.

101.   By means of EVO's wrongful conduct alleged herein, EVO knowingly engaged in billing practices against Plaintiff and members of the Class that are unfair, unconscionable, and oppressive.

102.   EVO knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Class.  In so doing, EVO acted with conscious disregard for the rights of Plaintiff and members of the Class.

103.   As a result of EVO's wrongful conduct as alleged herein, EVO has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

104.   EVO's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

105.   Under the common law doctrine of unjust enrichment, it is inequitable for EVO to be permitted to retain the benefits it has received, and is still receiving,

without justification, from the imposition of illicit fees and charges on Plaintiff and members of the Class in an unfair, unconscionable, and oppressive manner. EVO's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

106. The financial benefits derived by EVO rightfully belong to Plaintiff and members of the Class. EVO should be compelled to disgorge into a common fund for the benefit of Plaintiff and members of the Class all wrongful or inequitable proceeds. A constructive trust should be imposed upon all wrongful or inequitable sums received by EVO traceable to Plaintiff and the members of the Class.

107. Plaintiff and members of the Class have no adequate remedy at law.

## COUNT THREE
## DECLARATORY RELIEF –
## THE TERMS ARE NOT BINDING

108. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

109. The Terms are not a binding contractual document.

110. Indeed, EVO does not provide the Terms to prospective merchants prior to their execution of the Application. Nor are prospective merchants placed on reasonable notice that the Terms exist.

111. The Court should declare that Plaintiff and the Class are not bound by the Terms or the onerous, one-sided provisions set forth therein.

112. A judicial declaration in this regard is necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to the Terms.

<strong><u>COUNT FOUR</u></strong><br><strong><u>BREACH OF CONTRACT INCLUDING BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING</u></strong>

113. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

114. This claim is brought in the alternative to Counts One and Two, *supra*. In the event there is deemed to be a binding contract between EVO and Plaintiff and the Class, the actions taken by EVO have materially violated the specific terms of such contracts. Further, EVO has breached the contract by violating the covenant of good faith and fair dealing. EVO is liable for the losses of Plaintiffs and the Class that have resulted from its breaches of contract.

115. EVO violated the contract by assessing improper charges not provided for in the contract, to include improperly inflated charges, additional fees not even mentioned in the contract, and charges which should have been waived, and by unilaterally marking up agreed-upon fees and charges without legal basis and

without proper notice. Thus, EVO has materially breached the express terms of its own form contract.

116. Plaintiff and the Class have performed all, or substantially all, of the obligations imposed on them under the contracts, or those obligations have been waived by EVO.

117. Plaintiff and the Class sustained damages as a result of EVO's breaches of contract.

118. The law also imposes upon each party to a contract the duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute violations of good faith and fair dealing in the performance of contracts.

119. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

120.  By charging fees that are inconsistent with those laid out in the contract, including but not limited to, increasing the amounts of agreed-upon fees and imposing new categories of fees not referenced in the contract, EVO has violated the spirit of the contract and breached the covenant of good faith and fair dealing.  Even if EVO believed that it had given itself contractual discretion to increase mark-ups and fees, or add new fees, such discretion is constrained by good faith and fair dealing and EVO's actions do not comport with this duty.

121.  Plaintiff and the Class have performed all, or substantially all, of the obligations imposed on them under the contract.  There is no legitimate excuse or defense for EVO's conduct.

122.  Plaintiff and members of the Class sustained damages as a result of EVO's direct breaches of the contract and Defendant's breaches of the covenant of good faith and fair dealing.

## COUNT FIVE
## DECLARATORY RELIEF –
## INVALIDITY OF CERTAIN TERMS

123.  Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

124.  This Count is brought in the alternative to Counts One, Two, and Three, *supra*.  If the Court determines that no effective contract was formed

pursuant to Count One or that the Terms are not a binding contractual document, it will not need to address this Count.

125. EVO has increased agreed-upon fees and rates and attempted to immunize itself from liability for its practices by burying provisions in the adhesive Terms that purport to make it virtually impossible for merchants to obtain relief from EVO's overbilling practices. These provisions include but are not limited those set forth in Paragraph 74, *supra*.

126. Such provisions should be deemed unenforceable on multiple grounds.

127. For example, those provisions which give EVO unlimited discretion to increase fees or add new fees render the contract illusory and lacking in mutuality.

128. Moreover, these provisions and all others which Defendants have imposed to exculpate themselves from liability are invalid exculpatory clauses because they are not explicit, prominent, or clear.

129. Such provisions are also procedurally and substantively unconscionable.

130. Such provisions are procedurally unconscionable because EVO is a large company worth hundreds of millions of dollars and Plaintiff and the Class

members are small businesses.  Plaintiff and the Class members must accept debit and credit cards to make their businesses competitive in the marketplace and thus require merchant services.  They are thus at the mercy of companies such as EVO that provide such services.  The one-sided exculpatory clauses are standard in the industry and thus Plaintiff and the Class members lack any meaningful way to avoid them.

131.   Moreover, these take-it-or-leave-it provisions are buried in the Terms which consist of tiny, non-descript font.  The subject provisions are set forth in thick, densely-worded paragraphs and are not prominently distinguished in any manner from other contractual terms.   To say the provisions at issue are inconspicuous and difficult to comprehend is an understatement.   Indeed, the manner in which the clauses were formatted has the effect of garnering no attention.

132.  Moreover, the provisions are also substantively unconscionable because they are unreasonably favorable to EVO.  Indeed, because the provisions are included within the adhesive Terms, which were not negotiable, substantive unconscionability is clear.   No sane person would voluntarily accept such provisions.

133.   Thus, a judicial declaration is necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to these provisions.

134.   The Court should use its equitable powers to declare these provisions to be unenforceable and enjoin their enforcement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class demand a jury trial on all claims so triable and judgment as follows:

1.       Certifying this case as a class action pursuant to Federal Rule 23;

2.       Declaring the parties' respective rights and obligations under EVO's proposed merchant contract that purported to govern EVO's relationship with Plaintiff and the Class members;

3.       Awarding restitution of all improper fees seized by EVO from Plaintiff and the Class as a result of the wrongs alleged herein in an amount to be determined at trial;

4.       Compelling disgorgement of the ill-gotten gains derived by EVO from its misconduct;

5.       Awarding damages in an amount to be determined by a jury;

6.       Awarding compensatory, general, nominal, and punitive and exemplary damages, as allowed by law;

7.    Awarding pre-judgment interest at the maximum rate permitted;

8.    Reimbursing legal fees and costs accrued by Plaintiff in connection

with this action pursuant to applicable law; and

9.    Awarding such other relief as this Court deems just and proper.

Dated: April 12, 2017          Respectfully submitted,

                               WEBB, KLASE & LEMOND, LLC

                        By:  */s/ E. Adam Webb*
                             E. Adam Webb
                               Georgia Bar No. 743910
                             Matthew C. Klase
                               Georgia Bar No. 141903

                             1900 The Exchange, S.E.
                             Suite 480
                             Atlanta, Georgia 30339
                             (770) 444-0998
                             Adam@WebbLLC.com
                             Matt @WebbLLC.com

                             *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of April, 2017, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system which automatically sends email notification of such filing to all attorneys of record.

*/s/ E. Adam Webb*
E. Adam Webb